**Michael WEST, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–0001–CR–38.

Supreme Court of Indiana.

Sept. 24, 2001.

Katherine A. Cornelius, Marion County Public Defenders Office, Indianapolis, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

Michael West was convicted of felony murder and robbery. He was sentenced to life imprisonment without parole for felony murder and a twenty-year consecutive sentence for robbery. In this direct appeal, West raises five issues for review: (1) whether the Fourth Amendment requires the suppression of blood evidence and a knife obtained from his vehicle, or the suppression of West's hair and blood samples; (2) whether the trial court abused its discretion in the admission of certain evidence; (3) whether the trial court abused its discretion by improperly restricting West's cross-examination of three witnesses; (4) whether the evidence was sufficient to convict West of felony murder; and (5) whether West's sentence was proper. We affirm the trial court.

**Factual and Procedural Background**

In the early morning hours of April 29, 1998, police were dispatched to a Clark service station in Indianapolis which customers had found unattended. In the back room, police discovered the body of Carla Hollen. She had been stabbed over fifty times. The cash register tape showed that the register had been opened at 2:14 a.m. and $274.50 was missing.

West was Hollen's co-worker. On April 28, Hollen was scheduled to work from 10:00 or 10:30 p.m. until 6:00 a.m. West had worked a shift starting at 3:30 p.m. Pizza was delivered to the station between 11:30 and 11:45 p.m. and West's fingerprint was found on a pizza box in the station. Hollen's blood was found on the horn of West's Blazer, and shoeprints matching Caterpillar boots—the type West was known to wear—were found imprinted in Hollen's blood near her body. According to Jimmy Collins, whom West owed money, earlier that day West gave him $10 and two cartons of cigarettes, saying that was all he had. Shortly after the robbery,

West bought crack cocaine from Roy Rogers for $275.

West was arrested in September 1998. While incarcerated in Marion County Jail, West bragged to inmate James Warren that he and his cousin had robbed the Clark station and that he had tried to "stab [Hollen's] breasts off." A deputy sheriff assigned to transport prisoners, Brett Larkin, reported that West said, "I'm going to kill him, too," while referring to a picture of Warren among a pile of legal papers West was carrying.

A jury convicted West of murder, felony murder, and robbery as a Class A felony in September 1999. The trial court vacated the murder conviction and reduced the robbery conviction to a Class B felony.

## I. Search and Seizure Issues

### A. Search and Seizure of West's Blazer

West challenges the search of his Blazer that revealed Hollen's blood on the horn and a knife in the back seat. Two days after the crime, on May 1, 1998, police officers arrived at his home between 4:00 and 5:00 a.m. The Blazer was hauled away by a tow truck before West accompanied officers downtown to sign a consent form and answer questions. West was questioned by two officers in a small room with no windows and "handcuffs were within eyesight and readily available."

The State contends that West orally consented at his house to the search and processing by the crime lab of his vehicle. Later, at the police station, he signed a form entitled "Permission to Search (Not in Custody)," which also authorized seizure of items the police "deem[ed] as evidence or pertinent to their investigation." The form stated in capital letters at the bottom: "This permission is given knowingly and voluntarily upon full knowledge of my right to refuse such permission." The State also notes that West's statement was

a witness statement (i.e., West was interviewed only as an employee of the Clark station), that West was not read his rights or handcuffed, and that at the conclusion of the interview he was driven home. One of the detectives testified that, if West had asked to leave, he would have been free to do so. The interview did not last longer than an hour, and West was not arrested until four months later.

West argues that he was entitled to the advice of counsel before consenting to the search. West cites *Pirtle v. State,* 263 Ind. 16, 323 N.E.2d 634 (1975), where this Court, citing both the Sixth Amendment of the United States Constitution and Article I, Section 13 of the Indiana Constitution, held:

> [A] person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent. This right, of course, may be waived, but the burden will be upon the State to show that such waiver was explicit....

*Id.* at 29, 323 N.E.2d at 640. *Pirtle* emphasized "the importance of the right to counsel in protecting other constitutional rights." *Id.* at 28, 323 N.E.2d at 640. In *Pirtle,* the defendant consented to a search of his apartment after having been Mirandized and after his request for an attorney. *Pirtle* noted that the defendant had consented to a search at a time police no longer possessed any authority to speak with him. *Id.* at 24–25, 323 N.E.2d at 638.

The State contends that West was not "in custody" for purposes of the Fourth Amendment or Article I, Section 13 such that the right to the advice of counsel had attached. Whether a defendant is in custody for purposes of the Fourth Amendment and Article I, Section 13 is governed by an objective test. Ultimately, the question is whether a reason-

able person under the same circumstances would have believed that he was under arrest or not free to resist the entreaties of the police. *Joyner v. State*, 736 N.E.2d 232, 241 (Ind.2000); *Jones v. State*, 655 N.E.2d 49, 55 (Ind.1995) (citing *Florida v. Bostick*, 501 U.S. 429, 433–34, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Several circumstances have been held relevant to this issue: whether the defendant is read his Miranda rights or handcuffed or restrained in any way, and the manner in which the defendant is interrogated, *Torres v. State*, 673 N.E.2d 472, 474 (Ind. 1996), whether a person freely and voluntarily accompanies police officers, *Williams v. State*, 611 N.E.2d 649, 651–52 (Ind.Ct.App.1993) *trans. denied*, at what point the defendant is arrested for the crime under investigation, *id.* at 652, the length of the detention, *Cooley v. State*, 682 N.E.2d 1277, 1279 (Ind.1997), and the police officer's perception as to the defendant's freedom to leave at any time, *Joyner*, 736 N.E.2d at 241.

 We have no findings from the trial court on this issue. Although no single circumstance is dispositive, we agree with the State that the record supports the trial court's admission of the evidence on the ground that West was not in custody when he consented to the search. Detective Timothy Knight testified at trial that West agreed to speak with the police on May 1. However, according to Knight, West had been difficult to reach. When he learned West was at home in the early morning hours of May 1, the decision was made to call on him. Unlike the defendant in *Torres*, West was never handcuffed or otherwise restrained. Although the police went to West's home at a very early hour, there is nothing in the record controverting the State's evidence that West consented initially at his home and then voluntarily accompanied police to the station to sign the consent form. Thus, West had already orally consented to the search of his vehicle when the vehicle was impounded, and West followed up by giving his written consent on a form reciting that he was not "in custody." At police headquarters, West was questioned for about an hour and was either transported back to his home by police or picked up by his girlfriend. His arrest did not come until four months later.

 West urges that, even if he was not in custody, his consent was involuntary, a product of mere acquiescence to the authority of the police. In *Darnell v. State*, this Court held that consent to a warrantless search is valid unless "procured by fraud, duress, fear, intimidation, or where it is a mere submission to the supremacy of the law." 435 N.E.2d 250, 254 (Ind.1982). "Voluntariness is a question of fact to be determined from all of the circumstances." *Id.* As discussed above, there is nothing in the record to indicate that West's consent to the search was involuntary. After orally consenting to the search of the vehicle, West agreed to accompany officers to the police station where he signed a written waiver and made a witness statement. Thus, West's claim of involuntariness of his consent also fails.[1]

## B. *Blood and Hair Samples*

 West also objects to the admission of blood and hair samples. West gave his consent to the taking of the samples during a second interview on June 25, 1998,

---

1. On these same grounds, West also urges that his May 1 statement to police should be suppressed. Having determined that West was not in custody for purposes of the Fourth Amendment, however, he was not entitled to Miranda warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

over a month before he was arrested. West argues that he should have been given Miranda warnings prior to giving his consent and advised of his right to an attorney. The State counters that West again signed a "Permission to Search (Not in Custody)" form, which stated that West was aware of his right to refuse permission for the search. West alleges nothing that would indicate that he was in custody or otherwise entitled to be given the advice of counsel before consenting.[2] The admission of the blood and hair samples was proper.

## II. Evidentiary Challenges

### A. *The Pizza Box*

■■■ West first challenges the admission into evidence of his fingerprint from the pizza box found at the scene. Pizza was delivered to the Clark station at 11:30 p.m. the evening of the murder. West concedes the relevancy of the pizza box, but argues that "the fingerprint does not prove he was present at the time of the murder." Even if there were merit to this contention, West raised no objection to the admission of this evidence at trial. Thus, West has waived this argument for purposes of appellate review.[3] *Cutter v. State,* 725 N.E.2d 401, 405–06 (Ind.2000).

### B. *Expert Testimony*

■■■ West argues that, given his sentence of life without parole, a less deferential appellate standard of review of the

admission of expert evidence is appropriate. He cites no authority for this proposition, and we see no reason to adopt such a rule. This Court applies the same standard of review of evidentiary issues in death penalty cases that it does in reviewing any other criminal appeal. *See Thompson v. State,* 492 N.E.2d 264, 278 (Ind.1986). A fortiori, the same standard applies in life without parole cases.

### 1. *Caterpillar Brand Boots*

At trial, West objected to the expert testimony of witness David Brundage, who conducted a comparison of the shoeprints found at the crime scene with Caterpillar boots. Brundage is employed as a firearms and toolmark examiner by the Indianapolis–Marion County Forensic Services Agency ("Crime Lab"). West argues that expert testimony as to the shoeprint is inappropriate.

■■■ The Indiana Rules of Evidence provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ind. Evidence Rule 702(a). "Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Evid. R. 702(b). "The

---

2. West fails to allege how the admission of this evidence helped the State's case against him. At trial, West objected to its admission on the basis of relevancy, in addition to Miranda grounds. However, he made no argument at trial why this evidence was irrelevant and we do not address this argument here.

3. West also argues that the admission of the blood smear retrieved from his horn was error. This issue was discussed substantially in Part I, and West's objection to the admission of this evidence at trial was based on *Pirtle.*

Conceding relevancy, West argues only that, given the lack of other blood evidence found in the Blazer, the blood smear is "inconclusive." Evidence need not be conclusive to be relevant. In any event, "[I]t is well settled that a party may not object on one ground at trial and rely on a different ground on appeal." *Ajabu v. State,* 693 N.E.2d 921, 941 n. 26 (Ind.1998). Thus, any argument not based on the *Pirtle* issue is waived for purposes of review.

decision of the trial court as to reliability under Indiana Rule of Evidence 702(b) will be reviewed for an abuse of discretion." *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind.1997).

In *McGrew*, the defendant made an analogous claim, challenging the reliability of hair comparison analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court concluded that the trial court had not abused its discretion in allowing the admission of this evidence, pointing out that Indiana Rule of Evidence 702(b), unlike its federal counterpart, explicitly requires that the trial court be satisfied that the testimony be based upon reliable scientific principles. *McGrew*, 682 N.E.2d at 1290 (citing *Steward v. State*, 652 N.E.2d 490, 498–99 (Ind. 1995)). Reliability may be established by judicial notice or by the proponent of the scientific testimony providing sufficient foundation to convince the trial court that the scientific principles are reliable. *Id.* (citing *Steward v. State*, 652 N.E.2d 490, 498–99 (Ind.1995)). This Court further noted that, although *Daubert* is instructive, federal case law is not binding on the determination of state evidentiary law on this issue. *Id.*

The trial court conducted a hearing on West's motion in limine seeking to exclude this testimony. Brundage described his duties at the Crime Lab, the process of lifting and comparing prints, and testified that footwear examination is an area of study "generally accepted within the scientific community." Brundage testified that he had participated in an international symposium on the recovery of shoeprints, enhancement techniques, and comparison of footwear evidence. Brundage then went on to describe the procedure he had employed in comparing the shoeprint found at the crime scene with Caterpillar brand boots. The trial court denied West's motion in limine, concluding that Brundage was an expert in foot and bootwear impressions and that the State had satisfied Rule 702. At trial, West again objected, and the trial court again took testimony before ruling that Rule 702 had been satisfied by the State. As in *Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind.2001) (citing *Jervis v. State*, 679 N.E.2d 875, 881 (Ind.1997)), this testimony is on the margins of testimony governed by Rule of Evidence 702(b) as expert scientific testimony. To a great extent, it is simply a matter of observations of persons with specialized knowledge. The trial court did not abuse its discretion in admitting Brundage's testimony with regard to the footwear.

West also appears to argue that, because the shoeprint was determined to be a size nine and one half and his foot was found by a shoe salesman to be a ten-C, Brundage's testimony should not have been admitted. We believe that this issue bears on the weight to be given Brundage's testimony and not its admissibility.[4] *See Williams v. State*, 714 N.E.2d 644, 650 n. 4 (Ind.1999).

### 2. Pry Marks

West raises a similar argument concerning the admission of Brundage's testimony as to pry marks on the door to

---

4. West also argues, "Finding someone to be an expert should not relieve the court from its obligation to find the evidence's relevance outweighs its prejudicial value under IRE 401/403." That may be true, but West neither discusses this evidence's relevance nor weighs its probative value against the prejudice of its admission. The contention is therefore waived for failure to make a cogent argument. *See* Ind. Appellate Rule 8.3(A)(7) (now App. R. 46(A)(8)); *Ford v. State*, 718 N.E.2d 1104, 1107 n. 1 (Ind.1999).

the room in which Hollen's body was found. Brundage testified that the pry marks resulted when someone attempted to get out of the office, and not into the office. Angela McKnight, the owner of the station, testified that the pry marks were there when she bought the station. West objected to Brundage's testimony at trial on the ground that it was not a proper subject for expert testimony.

In addition to being an expert on footwear, Brundage testified that he had examined toolmark evidence, including prymark evidence, for twenty-seven years. Without citation to authority, West now argues that no special expertise was shown by the witness and that he therefore should not have been qualified as an expert on this subject. Given that Brundage testified to over twenty-seven years of examining precisely this type of evidence, we cannot conclude that the trial court abused its discretion in allowing Brundage's testimony as to pry marks.

### C. *Deputy Brett Larkin's Testimony*

At trial, Deputy Larkin testified that he stood behind West when West, pointing at a picture of jailhouse informant James Warren, exclaimed, "You see him, I'm going to kill him, too." West objected to the admission of Larkin's testimony under Indiana Rules of Evidence 403 and 404(b), and on appeal argues that the evidence was of limited relevancy and should have therefore been excluded. Specifically, West argues that if the statement had been taken seriously and were unambiguous, Larkin would have taken steps to protect Warren. Because Larkin did nothing to protect Warren, the argument

goes, Larkin's testimony should not have been admitted. We agree with the State that this argument goes to the weight to be given the evidence rather than its admissibility. As West concedes, threats against potential witnesses as attempts to conceal or suppress evidence are admissible as bearing upon knowledge of guilt. *Neal v. State*, 659 N.E.2d 122, 124 (Ind. 1995), *abrogated on other grounds by Richardson v. State*, 717 N.E.2d 32, 33 (Ind.1999). Moreover, as in *Barajas v. State*, 627 N.E.2d 437, 439 (Ind.1994), a statement by a defendant that he would kill another "too," is direct evidence of guilt. West's statement, like the defendant's in *Barajas*, suggested not just that he would like to kill someone, but that he had already killed one person. For this reason, the statement is relevant and admissible.

### D. *James Warren's Testimony*

West argues that the trial court erred in allowing Warren to testify regarding West's statements to him while residing in the same cellblock in the Marion County Jail. West raises several objections to this testimony, including that Warren received a deal for his testimony, that Warren had access to documents discussing the case and from which he could have concocted West's confession to the crime, and that Warren gradually added specifics to his recitation of West's story. These credibility issues were investigated by defense counsel on cross-examination. More importantly, West did not object to Warren's testimony at trial and has therefore waived this claim for purposes of review.[5]

---

**5.** West makes a number of other claims with respect to Warren's testimony, none of which have merit. West argues for the application of the "incredible dubiosity" doctrine. Even if West had objected to Warren's testimony, the "incredible dubiosity" rule is limited to a sole witness who presents inherently contradictory testimony that is equivocal or the result of coercion, combined with a complete lack of circumstantial evidence of the appel-

### E. *Testimony Regarding the Knives*

At trial, Daniel Rutledge, the younger brother of West's girlfriend, testified that shortly before Hollen's death two knives were missing from his collection. A crime scene specialist later testified that one of Rutledge's knives had turned up in the backseat of West's Blazer in the search. West did not object to Rutledge's or the crime scene specialist's testimony, but did later object to the admission of the knife on both relevancy grounds and on *Pirtle* grounds. The State argued that the knife was relevant because the victim was killed with a knife and this knife was found in West's car within two days of Hollen's stabbing.

 On appeal, West argues that the trial court abused its discretion in admitting the testimony of Rutledge and the specialist because the knife was never identified as being the murder weapon. Because he did not object at trial, West has waived any objection to the testimony of both witnesses. West also argues that the relevance of the knife itself was substantially outweighed by its prejudicial effect on the jury under Indiana Rule of Evidence 403. West could hardly have been greatly prejudiced by the admission of the knife when two witnesses had already testified to the knife's existence, and the specialist had reported it was found in West's Blazer. Neither its relevance nor any prejudice was significant. The trial court did not abuse its discretion in balancing the two.

## III. Limitation on Cross–Examination of Witnesses

West argues that he was denied "his right to present his defense" when the trial court limited or excluded (1) evidence that Hollen's husband was abusive towards her; (2) examination of Hollen's fear of John Phillips, from whom Hollen allegedly purchased drugs; and (3) West's cross-examination of Jimmy Collins, whom West owed money and who visited West at work the evening of Hollen's murder. West asserts that this testimony was relevant under Indiana Rule of Evidence 401, and that his right to confrontation was therefore impermissibly restricted in contravention of the Sixth Amendment of United States Constitution and Article I, Section 13 of the Indiana Constitution. West asserts that the excluded testimony would have demonstrated that there were others who "had problems" with Hollen, and that the jury would have found reasonable doubt if it had heard this testimony.

 The right to cross-examine is "one of the fundamental rights of our criminal justice system." *Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999) (quoting *Pigg v. State*, 603 N.E.2d 154, 155 (Ind.1992)). However, "trial judges retain wide latitude . . . to impose reasonable limits . . . based on concerns about, among other things,

---

lant's guilt. *Lee v. State*, 735 N.E.2d 1169, 1173 (Ind.2000).

West also argues that the standard for probable cause to issue a search or arrest warrant should be applied to the decision whether to allow testimony from a witness such as Warren. West cites no authority for this proposition, which is contrary to the basic proposition that the trier of fact evaluates credibility.

Finally, West argues for application of the corpus delicti rule, which provides that a crime cannot be proven solely on the basis of

a confession. *Workman v. State*, 716 N.E.2d 445, 447–48 (Ind.1999). In order for a confession to be introduced into evidence in Indiana, this rule provides that independent evidence must establish (1) the occurrence of the specific kind of injury, and (2) someone's criminal act as the cause of the injury. *Stevens v. State*, 691 N.E.2d 412, 424–25 (Ind. 1997). It is obvious that the corpus delicti doctrine does not apply here. There is no doubt that a crime occurred or that a criminal act was the cause of Hollen's death.

harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Thornton v. State*, 712 N.E.2d 960, 963 (Ind.1999) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

### A. Cross-examination of Mr. Hollen as to Domestic Abuse

■ On cross-examination of Hollen's husband at trial, defense counsel asked Mr. Hollen, "Didn't you put a bruise on her back the size of a softball." The State objected and reminded the court that the trial court had granted the State's motion in limine to exclude evidence of prior domestic abuse in the Hollen's marriage. Defense counsel apologized, and the court instructed the jury to disregard the statement. West argues that evidence of domestic abuse was highly relevant in view of the brutal nature of Hollen's death and that the trial court abused its discretion in refusing to allow Mr. Hollen to be cross-examined on this point. Although it is difficult to see how this evidence could lead to anything beyond speculation, we need not consider that issue because we agree with the State that West has waived this argument by failing to make an offer to prove. In order to preserve an issue for appellate review, a defendant must make an offer to prove, setting forth the grounds for admission of the evidence and the relevance of the testimony. Ind. Evidence Rule 103(a); *accord Noble v. State*, 725 N.E.2d 842, 846 (Ind.2000). West made no offer to prove after the State objected to defense counsel's line of questioning. Thus, the trial court had no opportunity to reconsider its ruling on the motion in limine and West has waived this claim.

### B. Cross-examination of John Phillips

■ The trial court granted the State's motion in limine seeking to suppress any evidence relating to Hollen's drug use, and, consequently, evidence relating to Hollen's relationship to John Phillips, who allegedly regularly supplied Hollen with cocaine. At trial, defense counsel attempted to suggest that Phillips could have killed Hollen by establishing that Phillips had been at the Clark station the day of Hollen's murder. West argues that the trial court abused its discretion in refusing to admit evidence of Hollen's drug purchases from Phillips. West also notes that "[Phillips'] testimony regarding where he was at the time of the murders was also inconsistent and incredible."

Defense counsel questioned Phillips about his whereabouts on the day of Hollen's murder, as well as the fact that police had taken blood and hair samples from him. West has not established how the evidence of Hollen's drug use raises anything more than speculation that a third party may have committed the crime. *See Cook v. State*, 734 N.E.2d 563, 567–68 (Ind. 2000) (evidence of motive of third party to commit a crime is relevant, but was properly excluded because of absence of evidence linking crime to a third party). The trial court was within its discretion to restrict exploration of collateral issues by excluding speculation as to the possibility that Phillips was the killer.

As this Court recently noted, evidence of a victim's prior drug use is often irrelevant, and, if relevant at all to a collateral issue, outweighed by the danger of unfair prejudice under Indiana Rule of Evidence 403. *See Jenkins v. State*, 729 N.E.2d 147, 149 (Ind.2000). The trial court did not abuse its discretion in limiting examination of Phillips on this issue.

### C. Cross-examination of Jimmy Collins

■ Lastly, West argues that Collins should have been allowed to testify that he

knew Roy Rogers to be a drug dealer, that he once lived with Rogers, and that Lori Rogers, a witness for the State, frequently purchased drugs from Rogers. Evidence of a witness' prior drug use is ordinarily irrelevant, although it may be relevant as to (1) the witness' ability to recall the events on the date in question, (2) the witness' inability to relate the facts at trial, or (3) the witness' mental capacity. *Williams v. State,* 681 N.E.2d 195, 199 (Ind.1997). West does not assert that this testimony would have been relevant for any of these reasons. The trial court did not abuse its discretion in failing to permit testimony as to Collins' association with Rogers or his knowledge concerning a State witness' drug use.

## IV. Sufficiency of the Evidence

West argues that there was insufficient evidence to find him guilty of killing Hollen. This contention relies on the premise that the blood smear seized from his Blazer should have been excluded under the Fourth Amendment, and that Warren's testimony should have been suppressed under the "incredible dubiosity rule." We rejected these arguments in Part I and Part II.D n. 5.

■ Our standard for review of sufficiency claims is well settled. We do not reweigh the evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and "will affirm the conviction if there is probative evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Taylor v. State,* 681 N.E.2d 1105, 1110 (Ind.1997). Felony murder consists of the killing of "another being while committing or attempting to commit" one of the listed felonies in Indiana Code section 35–42–1–1, including robbery.

■ On the day of the murder, West offered Collins a carton of cigarettes and $10 to repay a debt and asked Collins to try to convince Rogers to front him $30 so he could buy crack. Early the next morning, West had managed to assemble $275 to purchase an eight-ball of crack. This evidence of West's motive and acquisition of cash, along with the blood smear, the fingerprint on the pizza box, the footprint, and Warren's and Larkin's testimony, was more than sufficient for a reasonable jury to find West guilty beyond a reasonable doubt of felony murder.

## V. Sentencing

### A. *Aggravating Circumstances*

West argues that the trial court abused its discretion in sentencing him to life without parole in that it relied on questionable evidence and West's "insignificant" criminal history.

■ Trial courts may impose life without parole only after finding aggravating circumstances specified in the death penalty statute. Ind.Code § 35–50–2–9(b) (1998); *Warlick v. State,* 722 N.E.2d 809, 811 (Ind.2000). The trial court expressly concluded that the State had proved beyond a reasonable doubt that West intentionally killed Hollen while committing or attempting to commit robbery. This is a valid eligibility requirement under Indiana Code section 35–50–2–9(b)(1)(G) and the trial court did not abuse its discretion in relying on this factor in imposing life without parole on West.

■ This does not violate the well-established rule that a material element of the underlying offense may not serve as an aggravating circumstance to enhance a defendant's sentence. That rule apparently derives from *Green v. State,* 424 N.E.2d 1014, 1015 (Ind.1981), and is a judicial rule of construction. It is based on the sound

logic that a presumptive sentence already assumes the underlying elements and that it is therefore improper to enhance a sentence based on an act for which the defendant is already presumed to be punished. Sentencing pursuant to the death penalty or life without parole statute is a qualitatively different matter. The legislature has determined that some crimes, based on the circumstances in which they are committed, warrant the death penalty or life without parole. Some of these circumstances may include elements of the crimes themselves. Although the statute refers to these circumstances as "aggravating," they serve the narrowing function required by the Eighth Amendment. A defendant either meets or does not meet the eligibility requirements for death or life imprisonment. Under Indiana Code section 35–50–2–9(b)(1), the death penalty may be imposed for an intentional killing in the course of a felony. Proof that the defendant intentionally killed in the course of a felony is also among the ways in which felony murder may be proven, but not the only way. An accomplice to a felony resulting in death may also be convicted of felony murder. The (b)(1) aggravating circumstance thus serves to narrow the eligibility and is not identical to the elements of the crime. For this reason, it was proper for the trial court to sentence West to life without parole even though the trial court entered sentence on the felony murder conviction.[6]

### B. Manifestly Unreasonable Sentence

 West argues that his sentence was manifestly unreasonable in view of the na-

ture of the offense, the character of the offender, and the "level of proof"[7] of the crime. Although this Court has the constitutional authority to revise and review sentences, Ind. Const. art. VII, § 4, it will do so only when the sentence is "manifestly unreasonable in light of the nature of the offense and the character of the offender." Former Ind. Appellate Rule 17(B) (now App. R. 7(B)). The nature of the offense consists of robbing the Clark service station of $275 to purchase crack cocaine, and killing Hollen by stabbing her over fifty-one times because she was an eyewitness to the robbery. The character of the offender is that West, who had a long history of arrests for various offenses,[8] subsequently attempted to cover up the murder, and then, after being arrested for Hollen's murder, bragged about it to fellow inmates. There is nothing in the record to suggest that this sentence is manifestly unreasonable.

### C. Sentencing for Felony Murder and Robbery as a Class B Felony

 West was convicted of murder, felony murder, and robbery as a Class A felony. The trial court concluded that double jeopardy precluded sentencing on both the murder and felony murder convictions, and imposed its sentence only for the felony murder conviction. This, in turn, created the problem that double jeopardy precludes sentencing on felony murder and robbery, where the felony murder conviction is predicated on the robbery. See Richardson v. State, 717

---

6. West does not contend that these convictions violate double jeopardy, and we do not address this issue.

7. West cites no authority for the proposition that a sentence might be manifestly unreasonable in view of the "level of proof" of a defendant's guilt.

8. The offenses for which West was arrested included, among other things, burglary, theft, possession of cocaine, battery, and criminal confinement.

N.E.2d 32, 49 (Ind.1999) (It is a "violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish .the essential elements of another challenged offense.") (emphasis in original).

If sentence had been imposed for murder instead of felony murder, this would present no issue, and West has not raised any double jeopardy issue on appeal. Because life without parole was proper based on the felony murder conviction, however, any double jeopardy issue raised by the trial court's imposing sentence for felony murder and robbery as a Class B felony is of no practical consequence and we will not attempt to untangle this knot. *Cf. Roop v. State,* 730 N.E.2d 1267, 1270 n. 2 (Ind.2000).

## Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.