Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 10 2012, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**STEVEN H. SCHUTTE**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

MICHAEL WEST,                    )
                                 )
    Appellant,                   )
                                 )
    vs.                          )    No. 49A04-1108-PC-451
                                 )
STATE OF INDIANA,                )
                                 )
    Appellees.                   )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt Eisgruber, Judge
The Honorable Steven Rubick, Magistrate
Cause No. 49G01-9809-PC-143703

**May 10, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Michael West ("West") appeals the denial of his petition for post conviction relief

and raises two issues, which we restate as:

I. Whether the post-conviction court erred in concluding that West was not entitled to relief based on his claim of newly discovered evidence; and

II. Whether the post-conviction court erred in concluding that West did not receive ineffective assistance of counsel during the penalty phase of his trial.

We affirm.

## Facts and Procedural History

In its opinion arising out of West's direct appeal, our supreme court set out the

facts underlying West's convictions as follows:

In the early morning hours of April 29, 1998, police were dispatched to a Clark service station in Indianapolis which customers had found unattended. In the back room, police discovered the body of Carla Hollen. She had been stabbed over fifty times. The cash register tape showed that the register had been opened at 2:14 a.m. and $274.50 was missing.

West was Hollen's co-worker. On April 28, Hollen was scheduled to work from 10:00 or 10:30 p.m. until 6:00 a.m. West had worked a shift starting at 3:30 p.m. Pizza was delivered to the station between 11:30 and 11:45 p.m. and West's fingerprint was found on a pizza box in the station. Hollen's blood was found on the horn of West's Blazer, and shoeprints matching Caterpillar boots—the type West was known to wear—were found imprinted in Hollen's blood near her body. According to Jimmy Collins, whom West owed money, earlier that day West gave him $10 and two cartons of cigarettes, saying that was all he had. Shortly after the robbery, West bought crack cocaine from Roy Rogers for $275.

West was arrested in September 1998. While incarcerated in Marion County Jail, West bragged to inmate James Warren that he and his cousin had robbed the Clark station and that he had tried to "stab [Hollen's] breasts off." A deputy sheriff assigned to transport prisoners, Brett Larkin, reported that West said, "I'm going to kill him, too," while referring to a picture of Warren among a pile of legal papers West was carrying.

2

A jury convicted West of murder, felony murder, and robbery as a Class A felony in September 1999. The trial court vacated the murder conviction and reduced the robbery conviction to a Class B felony.

West v. State, 755 N.E.2d 173, 177-78 (Ind. 2001). At the conclusion of the penalty phase proceedings, the jury recommended that West be sentenced to life imprisonment without parole. West was subsequently sentenced to life imprisonment without parole for felony murder and a consecutive twenty-year sentence for robbery. Id. at 177. In his direct appeal to our supreme court, Williams argued that the trial court abused its discretion in admitting certain evidence and in restricting West's cross-examination of certain witnesses, that the State presented insufficient evidence to convict him of felony murder, and that his sentence was improper. Id. Our supreme court disagreed and affirmed West's convictions and sentence. Id.

On August 27, 2002, West filed a pro se petition for post-conviction relief, which was amended by counsel on April 24, 2009. West's petition alleged ineffective assistance of trial counsel and newly discovered evidence rendering West's convictions and sentence "unreliable." Appellant's App. p. 152.[1] Evidentiary hearings were held on April 6 and August 31, 2010. At the hearings, West alleged that his trial counsel was ineffective during the sentencing phase of his trial for failing to present West's addiction to crack cocaine to the jury as a mitigating circumstance. Additionally, West sought to introduce deposition testimony from three witnesses alleging that Phillip Taylor ("Taylor") had made statements indicating that he was the person who killed Hollen. The

---

[1] We refer to West's Appellant's Appendix in this matter as "Appellant's App.," the transcript of the post-conviction proceedings as "Tr.," and the trial record as "R."

State objected to the admission of the deposition testimony on the basis that it did not satisfy the requirements for newly discovered evidence. After West and the State briefed the issue, the post-conviction court issued an order on March 17, 2011 ruling that West's newly discovered evidence was inadmissible. Then, on July 20, 2011, the post-conviction court denied West's remaining claim of ineffective assistance of trial counsel. West now appeals. Additional facts will be provided as necessary.

### Post-Conviction Standard of Review

Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. McCary v. State, 761 N.E.2d 389, 391 (Ind. 2002). Rather, post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. Davidson v. State, 763 N.E.2d 441, 443 (Ind. 2002). A post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. Henley v. State, 881 N.E.2d 639, 643 (Ind. 2008). On appeal from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Id. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Id. at 643-44.

Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we cannot affirm the judgment on any legal basis, but rather, must determine if the court's findings are

4

sufficient to support its judgment. Graham v. State, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), aff'd of reh'g, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. Id. Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. Id.

### I. Newly Discovered Evidence

West argues that the post-conviction court erred in concluding that West was not entitled to relief based on his claim of newly discovered evidence. Specifically, West argues that he is entitled to relief because three witnesses testified in depositions that they heard Taylor state that he was the person who stabbed Hollen. One of the witnesses, Greg Blankenship ("Blankenship"), testified that Taylor had stated that he "stabbed [Hollen] so many times in the throat that her head almost fell off." Appellant's App. p. 169. Blankenship testified further that Taylor had made inculpatory statements on at least one other occasion. Ronnette Wilson ("Wilson"), and her boyfriend, Jeffrey Wallace ("Wallace"), both testified that they overheard heard Taylor threaten his wife by stating that he would "cut [her] up like [he] did [Hollen]." Appellant's App. pp. 190, 219. Wilson also testified that she had heard Taylor state that he had stabbed Hollen on at least one other occasion, and Wallace testified that he had also heard Taylor state that West was going to prison "for something [Taylor] did." Appellant's App. p. 216. In his

5

deposition, Taylor denied making these statements and denied any involvement in the murder.

On appeal, West argues that he is entitled to a new trial, or in the alternative, a new penalty phase proceeding. But West's theory with respect his proffered evidence is unclear; West never indicates whether he is arguing that Taylor was the killer and that he is innocent, or that he is guilty of the murder as an accomplice, but that he should not have received a sentence of life without parole because Taylor was the actual killer. Taylor was also charged with the crimes, but the State eventually dismissed the charges prior to West's trial. At trial, the theory was put forth that West and Taylor committed the crimes together, and the jury was instructed on accomplice liability. During the penalty phase of the trial, the defense set forth a theory of the case in which West was guilty of murder as an accomplice, with Taylor as the principal. During the post-conviction proceedings, the State apparently was operating on the assumption that West was arguing only that he was entitled to a new penalty phase proceeding on the theory that the deposition testimony established that Taylor was the principal in the murder, and West was therefore less culpable. However, West's petition for post-conviction relief stated that the newly discovered evidence rendered both his convictions and his sentence "unreliable." Appellant's App. p. 152. When the post-conviction court asked West's counsel whether he was seeking to admit the deposition testimony for the sole purpose of challenging the sentence of life without parole, counsel briefly equivocated before answering in the affirmative. Specifically, counsel stated "I wouldn't put it quite so

6

categorically, sir. I think this . . . does weigh more heavily in whether life without parole is an appropriate sentence than it weighs in whether Mr. West got a fair trial . . . yes, the short answer—if its not too late for a short answer to your question is yes." Tr. p. 71.

Because West expressly waived his claim that the deposition testimony entitled him to a new trial during the post-conviction proceedings, he cannot resurrect the argument on appeal. In the end, the distinction is of no moment because we reach the same conclusion regardless of whether West sought to admit the evidence to establish his innocence or to minimize his culpability.

Our supreme court has enunciated nine criteria for the admission of newly discovered evidence:

> [N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

Taylor v. State, 840 N.E.2d 324, 329-30 (Ind. 2006) (quoting Carter v. State, 738 N.E.2d 665, 671 (Ind. 2000)). We analyze these nine factors with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized. Id. at 330. "The burden of showing that all nine requirements are met rests with the petitioner for post-conviction relief." Id.

The post-conviction court ruled that the depositions were not admissible as newly discovered evidence because West had not satisfied the nine-part test from Taylor. West

7

first argues that the post-conviction court erred in construing the nine-part test as a test for determining the admissibility of newly discovered evidence in post-conviction proceedings instead of a test for determining whether a post-conviction petitioner is entitled to relief. However, we need not confront this issue because, under the facts and circumstances before us, the distinction is purely academic. Although the post-conviction court ruled that the depositions were inadmissible because they did not satisfy the nine-part test for newly discovered evidence, it is clear from the post-conviction court's findings that it considered the substance of the depositions and applied the nine-part test in making its determination. Accordingly, regardless of whether the post-conviction court's judgment is labeled a ruling on the admissibility of the deposition testimony or a judgment on whether West was entitled to relief, the result is the same: West was denied relief because the post-conviction court determined that the deposition testimony did not satisfy the nine-part test for newly discovered evidence.[2]

Turning now to the merits of the post-conviction court's determination that West was not entitled to relief, we note that the post-conviction court determined that several

---

[2] To the extent that West argues that he was deprived of the opportunity to present live witness testimony from the deponents, we note that West specifically asked the post-conviction court to accept the depositions as substantive evidence in lieu of live witness testimony even if the court ruled that the newly discovered evidence was admissible. Specifically, West's post-conviction counsel stated that "We can certainly continue with the argument about whether . . . the nine boxes that the Court is familiar with, whether that's a test for admissibility or for the granting of relief. . . . But either way, my proposal is going to be that he take those depositions and consider them as the substantive evidence on our claim." Tr. p. 76. West's post-conviction counsel stated further, "If you choose to rule that the boxes, the _Tongate_ [sic] test, is for admissibility, then [the depositions] I propose become my offer to prove. And if you choose that the evidence is admissible, then my suggestion . . . is that you consider those as—the testimony of those witnesses and go ahead and rule on the merits on the claim rather than set another day for another hearing . . . ." Tr. pp. 76-77. Because West indicated that he did not wish to present live witness testimony, and indeed asked the post-conviction court to consider the depositions in lieu of such testimony, he cannot now be heard to claim that the post-conviction court erred by depriving him of the opportunity to present live witness testimony. See Kingery v. State, 659 N.E.2d 490, 494 (Ind. 1995) ("A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error.").

8

of the requirements for a claim of newly discovered evidence had not been met. Specifically, the post-conviction court found that: (1) the deposition testimony consisted of inadmissible hearsay that "fail[ed] to provide verifiable facts that might lead to a different result" at trial; (2) the deposition testimony was merely impeaching, and (3) the deposition testimony was not worthy of credit. Appellant's App. pp. 237-38.

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. Boatner v. State, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010). As a general rule, hearsay is inadmissible unless the statement falls within one of the established hearsay exceptions. Yamobi v. State, 672 N.E.2d 1344, 1346 (Ind. 1996). One such exception exists for statements against interest. Williams v. State, 757 N.E.2d 1048, 1068 (Ind. Ct. App. 2001) (citing Ind. Evidence Rule 804(b)(3)), trans. denied. Specifically, Evidence Rule 804(b)(3) provides that:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception.

However, in order for a statement against interest to be admissible under Evidence Rule 804(b)(3), the declarant must be unavailable as a witness. Evid. R. 804(b).

On appeal, West does not dispute that the deposition testimony contains hearsay, but he argues that Taylor's statements to Blankenship, Wilson, and Wallace are all admissible as statements against interest. However, West has made no argument that

9

Taylor is unavailable for the purposes of Evidence Rule 804, and our review of the record reveals that West has not established that Taylor is unavailable to testify. Evidence Rule 804(a) provides that a declarant is unavailable for the purposes of the rule when the declarant:

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or
> (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
> (3) testifies to a lack of memory of the subject matter of the declarant's statement; or
> (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
> (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means.

Although it appears that Taylor might be exempt from testifying if he chose to invoke his Fifth Amendment privilege against self-incrimination, West has not established that Taylor invoked that right or that he would do so if he were called to testify. Indeed, West made no attempt to even call Taylor as a witness during the post-conviction proceedings. As a result, the post-conviction court never made a ruling that Taylor was exempted from testifying on the basis of privilege. See Evid. R. 804(a)(1) (providing that a declarant is unavailable for the purposes of the rule when he or she is exempted from testifying on the basis of privilege "by ruling of the court"). And Taylor willingly gave a deposition without invoking the privilege. Because West has not identified any other evidence suggesting that Taylor was unavailable for the purposes of Evidence Rule 804, he has not established that the post-conviction court erred in

10

concluding that the deposition testimony of Blankenship, Wilson, and Wallace was inadmissible hearsay.[3]

In his reply brief, West appears to argue that, notwithstanding our rules of evidence, due process would entitle him to present Taylor's purported confessions to Blankenship, Wilson, and Wallace at a new penalty phase proceeding. In support of this argument, West cites Chambers v. Mississippi, 410 U.S. 284 (1973), in which the United States Supreme Court held that, under some circumstances, the Fourteenth Amendment guarantee to a fair trial could override a state's interest in enforcing its criminal rules of evidence. West's argument in this regard is doubly waived, both for failure to raise the argument before the post-conviction court and for failure to raise the argument in his principal appellate brief.

And here, the post-conviction also found that West's proffered evidence was not worthy of credit. The post-conviction court made the following finding with respect to the credibility of the deposition testimony:

> The evidence submitted at trial is inconsistent with the long-delayed statements attributed to Phillip Taylor. Specifically, one of the late-developed witness depositions references a statement in which Phillip Taylor claimed to have "stabbed her so many times in the throat that her head almost fell off." Deposition of Greg Blankenship, p. 6. Nothing in the evidentiary record is consistent with this claim. Given that the alleged post-trial third-party confession rests on claims that are clearly inconsistent

---

[3] West's reliance in his reply brief on Thomas v. State, 580 N.E.2d 224 (Ind. 1991) is misplaced. In Thomas, which was decided prior the promulgation of the Indiana Rules of Evidence, our supreme court adopted Federal Rule of Evidence 804(b), which is similar to the current Indiana Evidence Rule 804(b), and also includes the requirement that the declarant be unavailable. Thomas, 580 N.E.2d at 226-27. In Thomas, there was no question that the declarant was unavailable to testify, because he was called as a witness and invoked his Fifth Amendment privilege. Id. at 225.

with the facts developed at trial, these hearsay claims are not worthy of credit.

Appellant's App. p. 238. The court also found that the proffered statements are inconsistent with Taylor's previous statements during the course of the investigation.

As a general matter, whether a witness's testimony is worthy of credit is a factual determination to be made by the post-conviction court, which has the opportunity to see and hear the witness testify. Whedon v. State, 900 N.E.2d 498, 504 (Ind. Ct. App. 2009), aff'd 905 N.E.2d 408 (Ind. 2009). It is not within an appellate court's province to replace the post-conviction court's assessment of credibility with its own. Id. However, because the post-conviction court's findings with respect to the credibility of West's proffered evidence were based solely on a written record, i.e. the depositions themselves, including a deposition of Taylor, and the trial record, West notes that this court is equally able to evaluate the testimony as the post-conviction court and invites us to conduct our own review of the evidence. Appellant's Br. at 12. There is case law supporting this proposition. See Houser v. State, 678 N.E.2d 95, 98 (Ind. 1997) (holding that there is no reason to defer to trial court findings where both the appellate and trial courts are reviewing a paper record); see also Lee v. State, 892 N.E.2d 1231, 1236-37 (Ind. 2008) ("Factual findings of the post-conviction court are subject to review under a clearly erroneous standard except when they are based entirely on a paper record."); Moshenek v. State, 868 N.E.2d 419, 424 (Ind. 2007) (holding that the appellate court owed no deference to trial court findings that were based on a paper record). But West also claims

12

that we are bound by the post-conviction court's findings and must ignore the additional weaknesses in the evidence pointed out by the State.  Reply Br. at 3.

West's simultaneous arguments that we are free to conduct our own evaluation of the proffered evidence but that we are limited to considering only the post-conviction court's findings are puzzling, to say the least.  We need not resolve the issue here, because whether we apply the clearly erroneous standard or conduct an independent evaluation of the evidence, we agree with the post-conviction court that the deposition testimony at issue is not worthy of credit.

In finding that West's proffered evidence was not worthy of credit, the post-conviction court noted that the statements attributed to Taylor were "long-delayed[.]" Appellant's App. p. 238.  We agree that the timing of the alleged statements and depositions seriously undermines their credibility.  See Carter, 738 N.E.2d at 672 (finding third party's confession not worthy of credit in part because third party never came forward with his story until after Carter's conviction).  The depositions were taken in May 2010, twelve years after the murder and nearly eleven years after West's convictions.  Blankenship testified that Taylor described the murder to him "about a year" prior to the deposition, which would have been approximately eleven years after the murder and over nine years after West's conviction.  Appellant's App. p. 173.  And although Wilson and Wallace described the same incident, in which they both claimed to have overheard Taylor threaten his wife by stating that he would "cut [her] up like [he] did [Hollen]," they disagree as to the timing of the statement.  Id. at 190, 219.  Wilson

13

testified that Taylor made the statement "six or seven years" before the deposition, which would have been five or six years after the murder and four or five years after West's convictions. Id. at 190. Wallace, on the other hand, testified that Taylor made the statement "four or five years" prior to the deposition, which would have been seven or eight years after the murder and six or seven years after West's convictions. Id. at 219. Wilson testified that Taylor made another statement about the murder "five or four" years before the deposition, which, again, would have been seven or eight years after the murder and six or seven years after West's convictions. Id. at 191. And Wallace testified that Taylor made the statement about West was going to prison for a crime Taylor committed in 1995, which was three years *before* the murder occurred. Id. at 216. Upon further questioning, Wallace stated that he thought Taylor made the statement while "they was [sic] in the middle of going to court[.]" Id. at 218.

Additionally, as noted by the post-conviction court, the statement Taylor made to Blankenship was inconsistent with the evidence presented at trial. Specifically, Blankenship testified that Taylor told him that he had "stabbed [Hollen] so many times in the throat that her head almost fell off." Appellant's App. p. 169. At trial, Dr. John E. Pless ("Dr. Pless"), the pathologist who supervised Hollen's autopsy, testified that Hollen was stabbed over fifty times. Dr. Pless testified that Hollen had six wounds to the face, nine wounds to the neck and chin, one of which penetrated the jugular vein, and fourteen stab wounds to the chest, one of which penetrated the pulmonary artery and another of which penetrated the lung. R. at 2395. There were three stab wounds to the right side of

14

Hollen's back, three stab wounds to left side of Hollen's chest under her armpit, four stab wounds to her right armpit area, and seventeen stab wounds to her arms. R. at 2395-96. The wounds to Hollen's neck and chin area were incise wounds, which are longer than they are deep, as opposed to stab wounds, which are deeper than they are long. R. at 2395, 2397. Autopsy photos show that the wounds to Hollen's neck and chin area include a large incise wound under her chin and a number of wounds near her collarbone, but there is virtually no damage to her throat, and certainly not the degree of trauma allegedly described by Taylor. R. at 2386, State's Ex. 82.

Additionally, at trial, the State presented evidence that while incarcerated in the Marion County Jail prior to his trial, West bragged to fellow inmate James Warren ("Warren") about robbing the Clark service station with his cousin and killing Hollen.[4] Specifically, Warren testified that West told him that he grabbed Hollen from behind and started stabbing her, and his cousin "freaked out" and asked him what he was doing. R. at 1821. West told his cousin to go get the money, and West continued stabbing Hollen. Warren testified further that West told him that he had "tried to stab her f***ing breasts off[.]" R. at 1821. The evidence presented at trial established that several of the wounds on Hollen's chest were located around her breasts, and Dr. Pless opined that Hollen was attacked while being restrained from behind. Thus, West's jailhouse confession to Warren is more consistent with the physical evidence presented at trial than the statement Blankenship attributed to Taylor.

---

[4] In his deposition, Taylor stated that he and West referred to each other as cousins.

15

West argues that even if Blankenship's testimony is discredited because the statements he attributed to Taylor were inconsistent with the physical evidence presented at trial, this is not a proper basis for discrediting the statements of Wilson and Wallace, who both testified that Taylor made general statements that he had stabbed Hollen, without providing additional detail. We disagree. Assuming that Taylor actually made the statements that Blankenship, Wilson, and Wallace attribute to him, Taylor's inaccurate description of Hollen's murder suggests that he did not actually commit the murder and casts doubt on all of his purported confessions. For all of these reasons, we agree with the post-conviction court's conclusion that the statements Blankenship attributed to Taylor were not worthy of credit. See Carter, 738 N.E.2d at 671 (finding that third party's testimony that he was in fact the shooter not worthy of credit, in part because the third party's confession was inconsistent with other evidence presented at trial).

We reiterate that we are required to review claims of newly discovered evidence with great caution and careful scrutiny. See Kubsch v. State, 934 N.E.2d 1138, 1145 (Ind. 2010). Under this rigorous standard, whether we apply the clearly erroneous standard or review the evidence *de novo*, we agree with the post-conviction court that the deposition testimony is not worthy of credit. We therefore affirm the post-conviction court's conclusion that West has not met the criteria for establishing a claim of newly discovered evidence.[5]

---

[5] Because we affirm the post-conviction court's judgment on other grounds, we need not address the court's finding that West's proffered evidence was merely impeaching.

16

## II. Ineffective Assistance of Trial Counsel

West argues that his trial counsel was ineffective during the penalty phase of his trial because counsel did not sufficiently investigate West's addiction to crack cocaine as a possible mitigating circumstance. In Timberlake v. State our supreme court summarized the law regarding claims of ineffective assistance of trial counsel:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

> Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The Strickland Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the Strickland test are separate and independent inquiries. Thus, [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

Our supreme court has held that the failure to investigate and present mitigating evidence during the penalty phase of a trial could constitute ineffective assistance of counsel. Ritchie v. State, 875 N.E.2d 706, 719 (Ind. 2007). "That is not to say that

17

counsel is required to present all available mitigation evidence. Counsel may make strategic judgments not to present certain types of mitigating evidence." Id. (citing Timberlake, 690 N.E.2d at 261 ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase.")). Put simply, counsel has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary. Id. at 719-20. "A strategic choice not to present mitigating evidence made after thorough investigation of law and relevant facts is virtually unchallengeable, but a strategic choice made after less than complete investigation is challengeable to the extent that reasonable professional judgment did not support the limitations on the investigation." Id. at 720.

In his petition for post-conviction relief, West asserted that "[t]rial counsel failed to investigate or otherwise prepare for the penalty phase of this trial." Appellant's App. p. 151. At the post-conviction hearings, West presented expert testimony concerning his genetic predisposition toward addiction and the mental impairment that results from the use of crack cocaine, as well as testimony from West's family members concerning his family history of substance abuse. The main thrust of the evidence was that West was predisposed to become an addict and that addiction impairs normal thinking patterns. In light of this evidence, West argued that trial counsel was ineffective for failing to sufficiently investigate West's addiction to crack cocaine, including his genetic predisposition toward addiction, as a possible mitigating factor in preparation for the penalty phase of West's trial. The post-conviction court disagreed and found that trial

counsel investigated possible mitigating evidence, "analyzed the evidence, made strategic decisions about which evidence was the strongest, and then presented that evidence to the jury during the penalty phase." Appellant's App. p. 261.

On appeal, West claims that "trial counsel utterly failed to conduct any meaningful mitigation investigation." Appellant's Br. at 15. We disagree. At the post-conviction hearing, Jack Crawford ("Crawford"), West's trial counsel, testified regarding his investigation of possible mitigating circumstances in preparation for the penalty phase of West's trial. Specifically, Crawford testified that "we talked to Michael's family. We developed some background on him looking for mitigating circumstances." Tr. p. 50. Crawford testified further that he tried to develop mitigating evidence, "but this was a very difficult case as far as mitigators go. [West] came from a very good family. . . . [T]here was no history of abuse in the family. He had two loving parents, several brothers I think who were fine upstanding citizens who have never been in trouble with the law." Tr. p. 58. In light of this testimony, the post-conviction court's finding that defense counsel conducted a sufficient investigation of possible mitigating circumstances is not clearly erroneous.

West also argues that trial counsel's investigation with respect to West's substance abuse as a possible mitigator was insufficient because counsel "did not secure any records or retain any experts" and because counsel did not question West's family about West's personal and family history of substance abuse. Appellant's App. p. 14. But it is clear from the trial record that defense counsel was well aware of West's problems with

19

substance abuse; indeed, the State's entire theory of the case was that West robbed and killed Hollen because he was desperate for money to purchase crack cocaine. Rather than develop West's substance abuse as a possible mitigating factor, defense counsel made a strategic decision to downplay West's substance abuse and pursue another course. Specifically, in light of the brutality of the murder and evidence indicating another man not matching West's description (possibly Taylor) was present at the service station at the time of the murder, defense counsel chose to pursue a theory of "residual doubt." At the post-conviction hearing, Crawford explained the strategy as follows:

> My feeling once I saw the evidence was if the jury was a hundred percent convinced that Michael West stabbed that woman 50 times that our chances on the LWOP—life without parole part of it were going to be very very difficult. I felt from the beginning that we had to show that there was—at least a likelihood if not a strong likelihood—at least a reasonable doubt that someone else killed that lady. . . . I think in [West's] case we tried to argue to the jury a theory called residual doubt or something comparable to that whereas, ladies and gentlemen, if there's any little sliver of doubt—you've already found him guilty beyond a reasonable doubt but if there's a sliver of doubt that Michael stabbed this woman rather than Mr. Taylor or some man with—tall man—skinny man with long stringy hair or another man we tried to—Mr. Phillips—the victim's drug supplier—if you think there's a possibility that someone else did this then don't impose such a serious penalty on the defendant. I think the thrust of our penalty phase defense because I just harken back if they believed he's the man that did this to that lady—the pictures were terrible and if they believed [West] did that they weren't going to cut him any slack at all. If they had any slight—maybe one of those jurors had some slight doubt—they were out about seven hours on the guilty phase—if there was any slight doubt that [West] actually intentionally did the crime then maybe someone would hang the jury as to the guilt [sic] phase and say he doesn't deserve life without parole.

Tr. pp. 56, 59-60.

20

Crawford's explanation of his penalty phase strategy is amply supported by the trial record. During the guilt phase of the trial, the jury was instructed on accomplice liability based on the State's theory that Taylor may also have been involved in the robbery and murder. During the penalty phase, Crawford carefully laid out a possible scenario in which West was guilty of murder only as an accomplice, and that Taylor was the actual killer. Under these facts and circumstances, we cannot conclude that trial counsel's strategic decision to pursue a theory of residual doubt instead of presenting evidence of West's drug addiction was unreasonable. Indeed, trial counsel could reasonably have concluded that presenting additional evidence of West's drug addiction to the jury would have supported the State's theory that West committed the murder in order to obtain money to purchase crack cocaine, and thereby undermined West's argument that he was not the actual killer.

Under these facts and circumstances, it is clear that West's trial counsel investigated possible mitigating circumstances before making a reasonable strategic decision to argue that West was not the actual killer instead of presenting evidence of West's drug addiction as a mitigating circumstance. Accordingly, West has not established that his trial counsel was ineffective during the penalty phase of his trial.

**Conclusion**

The post-conviction court did not err in concluding that West's proffered evidence did not satisfy the test for newly discovered evidence or in concluding that West had not established that he received ineffective assistance of counsel during the penalty phase of

his trial. Accordingly, West has not established that he is entitled to post-conviction relief.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.