## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 14 2019, 9:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Marietto V. Massillamany
Thomas W. Blessing
Latoya T. Highsaw
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mark Adrian Hughes,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 14, 2019

Court of Appeals Case No.
18A-CR-1007

Appeal from the Hamilton Superior Court

The Honorable Jonathan M. Brown, Judge

Trial Court Cause No.
29D02-1510-F5-9122

**Altice, Judge.**

# Case Summary[1]

In 2015, Mark Adrian Hughes was charged with two counts of burglary as Level 5 felonies and two counts of theft as Level 6 felonies stemming from the 2014 breaking and entering of two newly-constructed homes in Carmel and the theft of stainless-steel appliances installed therein. The matter proceeded to a jury trial. During trial, and over Hughes's objection, the trial court permitted the State to introduce evidence that in 2006 Hughes had been convicted of burglary and theft of stainless-steel appliances from newly-constructed homes in the Carmel area to show identity, common scheme or plan, or motive. The jury found Hughes guilty as charged,[2] and the trial court subsequently determined him to be a habitual offender. The trial court then sentenced Hughes to an aggregate term of ten years, with two years suspended. On appeal, Hughes presents four issues for our review, one of which we find dispositive: Did the trial court abuse its discretion in admitting evidence of Hughes' prior convictions? Because we find in Hughes's favor on this issue and remand for a new trial, we address Hughes's challenge to Final Instruction 15.

We reverse and remand.

---

[1] We held oral argument at Ivy Tech Community College - Lafayette on April 11, 2019, as part of our Appeals on Wheels program. We thank the staff for our warm reception and the students for their professionalism and attentiveness throughout the argument. We also commend counsel on the quality of their written and oral advocacy.

[2] The trial court merged the theft convictions with the burglary convictions.

## Facts & Procedural History

[3] In July 2014, Pulte Homes was finishing construction on a new spec home located on Repass Drive in Carmel. On July 10, a resource planning manager for Pulte went to check on the Repass Drive house and discovered that the house had been broken into and that the stainless-steel appliances, including a cooktop, microwave, dishwasher, and refrigerator, had been removed. He reported the burglary to the Carmel Police Department (CPD).

[4] CPD officers secured the scene. During their investigation, they learned that a wooden barrier placed across the driveway had been removed, the front door had been kicked in or pried open, the interior door between the house and the garage had been taken off its hinges, and the garage door had been released from its tracks. The officers also noted muddy shoeprints on the hardwood floors throughout the first floor. John Elliott, a civilian evidence technician with CPD, collected electrostatic lifts and photographs of the shoeprints. Based on the visible tread design and Jumpman logo, Elliott determined the shoeprints were made by a pair of size 10 ½ or 11 Nike Air Jordan athletic shoes.

[5] On July 21, 2014, CPD officers responded to another reported burglary on President Street in Carmel. A construction manager for Fischer Homes went to check on the home at this address and discovered that the stainless-steel appliances, including the refrigerator, dishwasher, cook top, double oven, washer, and dryer, had been removed. At this home, there was no forced entry

because the construction manager left finished homes unlocked. However, as with the Repass Drive home, there were muddy footprints throughout and the door between the house and the garage had been removed from its hinges. Elliott also responded to this burglary scene. He noted that there were fewer shoeprints and documented them with electrostatic lifts and photographs. The shoeprints were similar to those found in the Repass Drive home in that they were made by a size 10 ½ or 11 shoe that had a Jumpman logo molded into the sole.

[6] Elliott, who had over thirty years of experience with CPD, noticed what he considered to be similarities between these recent burglaries and two other burglaries he had investigated in 2006 that were within the same area of Carmel.[3] One of the prior burglaries was committed at a newly-constructed home on Montcalm Street in Carmel on January 10, 2006. During that burglary, forced entry into the home was made through an exterior garage door and the stainless-steel wine cooler and oven were removed. The stainless-steel refrigerator had been moved from the kitchen but was left in the passageway between the kitchen and the garage after it became stuck. Also, the stainless-steel oven had been pried from the cabinetry, but was left behind.

[7] The second of the prior burglaries occurred on December 15, 2006, at a newly-constructed home on Salamone Way in Carmel. Forced entry was made

---

[3] All four burglaries occurred within a three-to-five-mile radius of Carmel.

through a rear door off of the deck. Inside the house, the kitchen island had been broken loose from the floor and several appliances had been removed, except for the stainless-steel oven, which was found in the garage. Footprints on the hardwood floor led to the garage, where the door between the house and the garage had been removed from its hinges. A fingerprint was recovered during the investigation of this burglary and identified as belonging to Hughes. Hughes was charged with and ultimately pled guilty to burglarizing the Montcalm Street and Salamone Way houses.

[8]     Having identified Hughes as a suspect in the Repass Drive and President Street burglaries, police attempted to locate him and learned that he was incarcerated in the Hendricks County Jail. In October 2014, police obtained a warrant for Hughes's personal property that was being held by the jail and obtained the shoes Hughes was wearing when he was arrested on July 26, 2014. The shoes were size 11 Nike Air Jordan athletic shoes with a Jumpman logo molded into the soles. Hughes's shoes were sent to the Indiana State Police (ISP) laboratory for examination.

[9]     Sean Matusko, a forensic scientist with the ISP laboratory's latent-print unit, had undergone in-house training in shoeprint identification and had taken a class and attended eight conferences on the subject. Matusko explained in detail the four-step process he used in positively identifying seven shoeprints left at the Repass Drive house and one shoeprint left at the President Street house as being made by Hughes's shoes.

[10]     On October 13, 2015, the State charged Hughes with two counts of burglary as Level 5 felonies and two counts of theft as Level 6 felonies. The State also alleged Hughes was a habitual offender. On February 12, 2016, the State filed a notice of intent to introduce 404(b) evidence, generally alleging that Hughes had committed other similar burglaries. Hughes objected. The trial court held a hearing on the matter of 404(b) evidence, and on May 13, 2016, the court ruled that the State could introduce evidence of Hughes's 2006 convictions to show identity and plan.[4]

[11]     On February 7, 2018, Hughes filed a motion to exclude evidence that the shoeprints found at the scenes of the two burglaries matched his shoes. On February 14, 2018, Hughes filed a notice of discovery stating his intent to offer into evidence at trial a publication by The President's Council of Advisors on Science and Technology (PCAST) that cast doubt on the scientific reliability of shoeprint analysis when offered in court to prove that a shoeprint was made by a particular shoe. The State filed a motion in limine to exclude the PCAST publication from evidence. The court held a hearing on these pending motions on March 2, 2018. At this hearing, Hughes argued that the PCAST publication was admissible and cross-examined Matusko regarding the contents thereof. The State argued that the PCAST publication was inadmissible because it was hearsay. The State also argued that because Matusko was a witness with

---

[4] Thereafter, Hughes filed a motion to exclude the evidence of his prior convictions pursuant to Ind. Evid. R. 403, which motion the trial court denied. The trial court granted Hughes's request to certify the matter for interlocutory appeal. This court, however, declined to accept jurisdiction.

specialized knowledge whose testimony was governed by Ind. Evidence Rule 701, rather than an expert witness under Evid. R. 702, the PCAST publication could not be used to cross-examine him about the scientific reliability of the process he utilized.

[12] At the conclusion of the hearing, the trial court determined that Matusko was a skilled witness and therefore ruled that the PCAST publication would not be admissible at trial and that Hughes would not be permitted to cross-examine Matusko regarding the contents of the publication. The trial court also denied Hughes's motion to exclude the shoeprint evidence, in particular Matusko's testimony that shoeprints found at both crime scenes were made by Hughes's shoes.

[13] A jury trial was held on March 14 and 15, 2018. During opening statements, the State told the jury that Elliott, who had responded to both crime scenes, "recognize[d] these burglaries as being very similar to ones committed in the past by Mark Hughes." *Transcript Vol. 3* at 85. Hughes objected. At the close of the State's evidence, Hughes moved for a directed verdict, which the trial court denied. Over Hughes's objection, the trial court provided the jury with Final Instruction 15, which states:

> Generally, a witness may not express an opinion. However, one who follows a profession or special line of work is permitted to express an opinion because of his knowledge, skill, experience, training, or education of the witness. The purpose of such testimony is to help you in arriving at a just verdict.

You should judge the testimony of an *expert* witness in the same manner as you do the testimony of any other witness. In deciding its weight, you may take into consideration the *expert's* skill, experience, knowledge, veracity, familiarity with the facts of the case, and the general rules for deciding the credibility of witnesses.

*Transcript Vol. 5* at 135 (emphasis supplied).

[14] The jury found Hughes guilty on all charges. Hughes waived his right to a jury with respect to the habitual offender phase. The trial court then found Hughes to be a habitual offender. The trial court entered convictions on only the burglary counts and sentenced Hughes to an aggregate sentence of ten years, with two years suspended to probation, to be served consecutively to the sentence imposed in an unrelated case. Hughes now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. 404(b) Evidence

[15] In assessing the admissibility of evidence under Evid. R. 404(b), the trial court must: (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Ceaser v. State*, 964 N.E.2d 911, 915 (Ind. Ct. App. 2012), *trans. denied*. We review evidentiary decisions for an abuse of discretion and will reverse only when the decision is clearly against the logic and effect of the

facts and circumstances before the trial court. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). "A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party." *McCarthy v. State*, 749 N.E.2d 528, 536 (Ind. 2001).

[16] Our Supreme Court recognized long ago:

> The notion that the State may not punish a person for his character is one of the foundations of our system of jurisprudence. Evidence of misconduct other than that with which one is charged ("uncharged misconduct") will naturally give rise to the inference that the defendant is of bad character. This, in turn, poses the danger that the jury will convict the defendant solely on this inference.
>
> Exceptions to this rule must be applied with caution. Evidence of uncharged misconduct is generally inadmissible if its sole relevance is to show that the defendant's general character is bad and that he therefore has a tendency to commit crimes.

*Penley v. State*, 506 N.E.2d 806, 808 (Ind. 1987) (internal quotations and citations omitted).

[17] As a general rule, evidence of prior crimes may not be used as evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid. R. 404(b)(1). The well-established rationale behind this rule is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Hardin v. State*, 611 N.E.2d 123, 129

(Ind. 1993). Such evidence, however, may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). Here, the trial court admitted Hughes's prior convictions as proof of identity and plan.

[18] The identity exception was carved out primarily for crimes "so nearly identical that the modus operandi is virtually a 'signature.'" *Allen v. State*, 720 N.E.2d 707, 711 (Ind. 1999) (citing *Thompson v. State*, 690 N.E.2d 224, 234 (Ind. 1997)). In considering whether identity evidence constitutes a signature crime, the focus is on whether "the crimes, or means used to commit them, were so similar and unique that it is highly probable that the same person committed all of them." *Thompson*, 690 N.E.2d at 234 (citing *Lockhart v. State*, 609 N.E.2d 1093, 1097 (Ind. 1993)). "[T]he repeated commission of similar crimes is not enough to qualify for the exception to the general rule. The acts or methods employed must be so similar, unusual and distinctive as to earmark them as the acts of the accused." *Willis v. State*, 374 N.E.2d 520, 522 (Ind. 1978).

[19] In *Allen*, *supra*, this court identified circumstances between two crimes that were so strikingly similar as to qualify as a signature crime. In that case, the victim (Jackson) had been bound with duct tape around her arms, legs and from ear to ear, sexually assaulted, and strangled to death. Police recovered a note from the victim's bedroom with the defendant's pager number and the name "Play." During the investigation into the victim's murder, the defendant was arrested for raping another woman (Franklin), who said that the defendant introduced himself to her as "Play", had given her his pager number, bound her hands with

duct tape, threatened to bind her mouth and legs with duct tape, and raped her. Police believed that the two crimes were similar in that both victims were bound with duct tape, sexually assaulted, and both had defendant's pager number and knew him as "Play." The defendant was charged for the Franklin incident and found not guilty of robbery and criminal deviate conduct and the jury hung on the rape and confinement charges.

[20] At the jury trial for the murder of Jackson, the State was permitted to introduce evidence of the rape of Franklin to prove defendant's identity as the perpetrator of the murder and sexual assault of Jackson. Our Supreme Court considered the similarities in the crimes, noting that both victims were African-American teenage girls, both crimes occurred in the same neighborhood within two months of each other, one victim had her assailant's beeper number and knew him as "Play" and a piece of paper found in the murder victim's bedroom had the defendant's beeper number and the name "Play" written on it, both victims were bound with duct tape, in both cases the duct tape was removed after the attack, and both incidents involved some sort of anal probing or penetration. In light of the striking similarities in the crimes, the Supreme Court held that the trial court did not abuse its discretion in admitting the evidence of the rape of Franklin under the identity exception of Evid. R. 404(b).

[21] The Court further concluded that because such evidence was substantially probative as to the identity of the decedent's attacker, such outweighed the

danger of unfair prejudice.[5] *Cf. Manuel v. State*, 793 N.E.2d 1215 (Ind. Ct. App. 2003) (holding that child victim's testimony about prior uncharged molestations her father committed against her was not admissible to prove identity where victim's testimony was extremely vague and only purpose was to establish defendant's propensity to commit the crime); *Berry v. State*, 715 N.E.2d 864 (Ind. 1999) (holding that similarities between two crimes—perpetrator of each crime was wearing a blue jacket and used a shotgun—were not sufficiently distinctive to make evidence of the second crime admissible under Evid. R. 404(b)).

[22] Hughes argues that, unlike in *Allen*, the circumstances giving rise to his prior convictions were not so strikingly similar to the current offenses as to establish a signature. Hughes asserts that eight years passed between commission of the offenses and that "the only apparent similarity" between the 2006 burglaries and the current offenses is that they both involve theft of stainless-steel appliances from newly-constructed homes in Carmel, circumstances which Hughes claims are not unique. *Appellant's Brief* at 17. Hughes also points out the differences in the burglaries, including that in the prior burglaries an appliance was left at the scene while all were taken in the recent burglaries and that the manner of entry for each burglary was different. Hughes asserts that many burglaries and thefts will have rough parallels. He admits that his prior

---

[5] In *Caldwell v. State*, 43 N.E.3d 258, 265 (Ind. Ct. App. 2015), *trans. denied*, this court referred to the *Allen* case as "illustrat[ing] just how similar two crimes must be in order to constitute a 'virtual signature.'"

burglaries are similar to the current offenses, but maintains that they are not so strikingly similar or unique as to constitute a signature for purposes of establishing identity.

[23] In response, the State asserts that the time period between the burglaries is not essential to our analysis and that such detracts from the "significant commonalities" between the 2006 and 2014 burglaries that establish the *modus operandi*, including that the past and present burglaries involved the theft of stainless-steel appliances from newly-constructed homes, the appliances were removed through the garage, in three of the four burglaries the door between the house and the garage was removed from its hinges, and all four burglaries were in close proximity. *Appellee's Brief* at 18.

[24] We agree with Hughes that the similarities between the 2006 burglaries and the current burglaries present only a "loose common denominator." *Appellant's Brief* at 18. The circumstances and the manner in which the burglaries were carried out are not so unique or strikingly similar that it is highly probable that the same person committed all of them. Indeed, with regard to the similarities, the State observes that stainless-steel appliances are common fixtures. Further, appliances, unlike copper wiring, plumbing, or pipes, are more readily movable from a home that is near the end of the construction process. Finally, the fact that the door between the kitchen and the garage was removed from its hinges is not particularly unique given that the nature of the items taken—i.e., bulky, heavy appliances.

[25]   By definition, many burglaries and thefts will have rough parallels. Here, a comparison of the circumstances surrounding the 2006 burglaries and the 2014 burglaries demonstrate that the offenses were generally similar. We, however, find nothing so strikingly similar or unique about the circumstances as to constitute a signature. Rather, the admission of evidence pertaining to Hughes's prior convictions for burglary eight years prior served only to prove that he had a propensity to commit burglary. This is not permissible. *See Willis*, 374 N.E.2d at 522.

[26]   The State also asserts, and the trial court found, that aside from identity, the evidence of Hughes's prior convictions was admissible to establish Hughes's plan to gain by stealing stainless-steel appliances from newly-constructed homes in a narrowly-targeted area. Evid. R. 404(b)(2). The State further points out that the trial court admonished the jury at the time the evidence was introduced[6] and instructed the jury as part of final instructions[7] that Hughes's

---

[6] The trial court admonished the jury as follows:

> All right. I have an instruction for you with regards to that document. Okay? So the evidence has been introduced that the Defendant was involved in crimes other than those charged in the information. This evidence has been received solely on the issue of Defendant's identity and plan. This evidence should be considered by you only for that limited purpose.

*Transcript Vol. 4* at 176.

[7] Final Instruction No. 14 provided:

> Evidence has been introduced that the Defendant was involved in crimes other than those charged in the information. This evidence has been received solely on the issue of Defendant's identity and plan. This evidence should be considered by you only for that limited purpose.

*Transcript Vol. 5* at 134-35.

2006 convictions were to be considered solely on the issue of Hughes's identity or plan.

[27]  The plan exception of Evid. R. 404(b), permits "proof of an uncharged crime as evidence of a preconceived plan which included the charged crime." *Lannan v. State*, 600 N.E.2d 1334, 1339 (Ind. 1992). "The crimes must, therefore, be so related in character, time and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime." *Id.* (quoting *Malone v. State*, 441 N.E.2d 1339, 1347 (Ind. 1982)). In addition to finding only general similarities between the 2006 and 2014 burglaries, we note that eight years passed between the two sets of burglary offenses. Given these circumstances, Hughes's prior convictions were not relevant to establishing a plan.

[28]  More importantly, we have long observed that evidence of a prior conviction is as prejudicial as evidence can get, and admission of such evidence requires a strong showing of probative value. *See* Evid. R. 403. Hughes's prior convictions were not admissible to prove identity or plan and served only to establish a propensity to commit burglary. The probative value of such prior convictions does not even come close to outweighing the prejudice Hughes suffered from admission of such evidence. Our cases have long admonished that "one crime cannot be proved in order to establish another distinct crime even though they be of the same kind. Such evidence is highly prejudicial." *Loveless v. State*, 166 N.E.2d 864, 866 (1960) (in prosecution for burglary, erroneous admission of defendant's alleged involvement in prior burglaries

required new trial). The admission of evidence relating to Hughes's prior burglary convictions affected his substantial rights, and the trial court's admonishment and instructions to the jury to consider such evidence only for the limited purpose of Hughes's identity and plan did not negate the substantial prejudice he suffered.

[29] We also reject the State's suggestion that such error was harmless. Errors in the admission of evidence are harmless when "the conviction is supported by substantial independent evidence of guilt so as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction." *Messel v. State*, 80 N.E.3d 230, 232 (Ind. ct. app. 2017), *trans. denied*. Without the evidence of Hughes's prior convictions, the State's case consisted of the shoeprint evidence, which established only his presence at the crime scenes at some point.[8] There were no eyewitnesses, no other physical evidence placing Hughes at the crime scenes, and no evidence linking him to the missing appliances. The State's meager evidence only confirms that the erroneous admission of Hughes's prior convictions contributed to his convictions.

[30] Because we reverse Hughes's convictions and remand for further proceedings, we address two additional issues presented by Hughes that might arise on remand. First, Hughes argues the trial court erred in finding that Matusko was

---

[8] "[M]ere presence at the crime scene with opportunity to commit a crime is not a sufficient basis on which to support a conviction." *Brink v. State*, 837 N.E.2d 192, 194 (Ind. Ct. App. 2005), *trans. denied*.

a skilled witness, as opposed to an expert witness, thereby allowing Matusko to give expert opinion testimony without requiring the State to demonstrate the reliability of the scientific principles upon which Matusko's opinion were based.

[31]     A skilled witness does not have the "scientific, technical, or other specialized knowledge" of experts and their testimony is based on their perceptions alone, not necessarily established scientific principles. *Satterfield v. State*, 33 N.E.3d 344, 352-53 (Ind. 2015). An expert witness is "qualified . . . by knowledge, skill, experience, training, or education" and "may testify in the form of an opinion or otherwise." Evid. R. 702(a). "Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles." Evid. R. 702(b). Whether a witness qualifies as an expert witness is a matter within the trial court's sound discretion. *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003). In the area of shoeprint identification, witnesses have been treated as both skilled and expert witnesses.

[32]     In *Stroud v. State*, 809 N.E.2d 274 (Ind. 2004), our Supreme Court upheld the admission of a police officer's testimony comparing the size for Reebok and Nike shoes from his personal experiences under Evid. R. 701. In *West v. State*, 755 N.E.2d 173 (Ind. 2001), the State specifically offered, and the trial court admitted, testimony from a shoeprint examiner under Evid. R. 702. The Court noted that the witness described his duties at the crime lab, the process of lifting and comparing shoeprints, and testified that footwear examination is "generally accepted within the scientific community." *West*, 755 N.E.2d at 181. The Court also noted that the witness testified he had participated in an

international symposium on recovery and enhancement techniques for shoeprint analysis and described the procedure he used in comparing the shoeprint found at the scene with a particular brand. The Court noted that the testimony provided by the shoeprint examiner was "on the margins of testimony governed by Rule of Evidence 702(b)," but noted that "[t]o a great extent, it [wa]s simply a matter of observations of persons with specialized knowledge." *Id.*[9] The Court held that the trial court did not abuse its discretion in admitting the testimony of the shoeprint examiner under Evid. R. 702.

[33] Hughes challenges the trial court's treatment of the State's shoeprint examiner, Matusko, as a skilled witness. Here, Matusko did not simply testify based on his personal experience as did the police officer in *Stroud*. Rather, like the shoeprint examiner in *West*, Matusko identified himself as a forensic scientist assigned to the latent print identification unit of the Indiana State Police, set out his academic background, detailed his training with regard to shoeprint identification, and explained in detail the process he used to identify shoeprints at both crime scenes as being made by Hughes's shoes. With its decisions in *Stroud* and *West*, our Supreme Court has indicated that it is not inclined to consider all testimony relating to shoeprint identification to be opinion testimony governed by Evid. R. 702. In light of such precedent and our

---

[9] *See also Turner v. State*, 953 N.E.2d 1039, 1053 (Ind. 2011) (noting that firearm identification, like shoeprint identification, can "straddle[] the line" between evidence admissible under Evid. R. 701 and 702).

standard of review, we cannot say that the trial court abused its discretion in admitting Matusko's testimony under Evid. R. 701.

[34] We are troubled, however, by the trial court's giving of Final Instruction 15, which twice refers to testimony of an *expert* witness. Matusko is the only State witness who could have been perceived by the jury to have been such an expert. Final Instruction 15 is problematic for two reasons. In so instructing the jury, the trial court essentially identified Matusko as an expert and enhanced his credibility. *See Turner v. State*, 953 N.E.2d 1039, 1054 n.7 (Ind. 2011) (acknowledging the risk that a jury will attach greater weight to an expert witness due to the expert's background and approach); *see also Ruiz v. State*, 926 N.E.2d 532, 535 (Ind. Ct. App. 2010), *trans. denied*. Second, the trial court's determination that Matusko was not an expert served as the basis for limiting Hughes's cross-examination of him regarding the scientific reliability of the process on which he based his opinion.[10] On retrial, if the court reaches the same conclusion that Matusko is not an expert, what is delineated as Final Instruction 15 in this case would not be a proper instruction to be given to the jury.

[35] Judgment reversed and remanded for further proceedings.

---

[10] As set out above, Hughes sought but was denied the opportunity to cross-examine Matusko with findings set out in the PCAST publication concerning reliability of shoeprint identification. Although we did not reach the merits of the admissibility of the PCAST publication, cross-examination regarding the findings therein was permissible regardless of whether Matusko was an expert or a skilled witness.

Baker, J. and Robb, J., concur.